**Deborah Wilder JOHNSON, Administratrix of the Estate of William Wilder, Deceased, Plaintiff,**

v.

**CITY OF CINCINNATI, et al., Defendants.**

**No. C–197–593.**

United States District Court,
S.D. Ohio,
Western Division.

Jan. 8, 1999.

Kenneth L. Lawson, Lawson & McLean, Cincinnati, OH, Robert Brand Newman, Lisa Talmadge Meeks, Newman & Meeks Co. LPA, Cincinnati, OH, for plaintiff.

Mary Fay Danner Dupuis, Cincinnati, OH, Donald Edson Hardin, Hardin Lefton Lazarus & Marks LLC, Cincinnati, OH, Mark S. Yurick, Assistant City Solicitor, Cincinnati, OH, Fay Dupuis, City Solicitor, Cincinnati City Solicitor, Cincinnati, OH, for defendants.

Thomas W Condit, Condit & Dressing, Cincinnati, OH, Donald Edson Hardin, Mark S Yurick, Fay Dupuis, City Solicitor, for David Greve, Firefighter, defendant.

## ORDER DENYING THE DEFEN-DANT'S MOTION FOR SUM-MARY JUDGMENT

DLOTT, District Judge.

This matter is before the Court on Defendant City of Cincinnati's Motion for Summary Judgment (doc. # 21), pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court finds that genuine issues of material fact remain and, therefore, Defendant City of Cincinnati's Motion for Summary Judgment is hereby **DENIED**.

## I. INTRODUCTION AND STATEMENT OF THE FACTS

Plaintiff filed this suit against the City of Cincinnati ("City") and individually named police officers and fire fighters arising from the death of William Wilder while in the Defendants' custody. On July 1, 1995, William Wilder had an epileptic seizure while at the home of one of his friends. Wilder's friends immediately called 911. Several Cincinnati firefighters and police officers responded to the call and attempted to restrain Wilder. They placed Wilder face down on a stretcher with his legs tied and his hands cuffed behind his back. Wilder subsequently became very quiet and had no vital signs. He was transported to University Hospital where he was pronounced dead. The alleged cause of death was "cardiac dysrhythmia" due to "agitated delirium with restraint," a type of sudden death caused by the combination of delirious mania and restraint.

Plaintiff, the administratrix of Wilder's estate, asserts claims against all Defendants pursuant to 42 U.S.C. § 1983 for violations of Wilder's Fourth Amendment right to be free from unreasonable seizure and his Fourteenth Amendment right to be provided adequate medical care. He also asserts claims against the individually named Defendants for wrongful death. The claim against the City is premised on the City's alleged failure to properly train the individually named Defendants. Defendant City filed this Motion for Summary Judgment on August 3, 1998.

## II. LEGAL STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue

of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which nonmoving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On those issues for which it shoulders the burden of proof, the moving party must make a showing that is " 'sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.' " *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)) (emphasis omitted). For those issues where the moving party will *not* have the burden of proof at trial, the movant must "point[ ]out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e). If the defendant moves for summary judgment based on the lack of proof of a material fact, "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient" to overcome the summary judgment motion. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[i]f the evidence is merely color-able, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

### III. ANALYSIS

Plaintiff can sustain a claim of municipal liability under 42 U.S.C. § 1983 on the basis of a failure to adequately train "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Generally, municipal liability under § 1983 is established by proving that a municipal policy or custom deprived a claimant of a constitutional right. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In claims like the one at bar, "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197.

The Sixth Circuit has recognized municipal liability for failure to adequately train. To establish a claim of § 1983 liability for failure to adequately train, Plaintiff has the burden of proving the following three elements: (1) the training program is inadequate to the tasks that officers must perform; (2) the inadequacy is the result of the city's deliberate indifference; and (3) and the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury. *See City of Canton*, 489 U.S. at 389–91, 109 S.Ct. 1197; *Berry v. City of Detroit*, 25 F.3d 1342, 1346 (6th Cir.1994). The ultimate burden on the Plaintiff is high. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [the Supreme Court's] prior cases—can a city be liable for such a failure under § 1983." *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197.

To defeat the City's Motion for Summary Judgment, Plaintiff must point to specific facts which would show there is a genuine issue for trial on each of these three elements. Fed.R.Civ.P. 56(e). Plaintiff's claim rests on the supposition that Wilder died from agitated delirium with restraint. That is, Plaintiff argues that Wilder was the victim of an allegedly well known syndrome of sudden death occurring when an agitated person is restrained in a prone position. Proponents of sudden death due to agitated delirium with restraint believe that putting an agitated or excited person in the prone position can interfere with respiration and lead to asphyxia. Plaintiff argues that the City had knowledge that individuals suffering from agitated delirium faced the possibility of sudden death if restrained in a prone position. Despite allegedly having that knowledge, Plaintiff argues that the City failed to adequately train the individually named Defendants on how to restrain persons suffering from agitated delirium.

## A. The Evidence Before the Court

Defendant City argues that the Court cannot consider the opinions of two experts offered by the Plaintiff, Dr. Ronald O'Halloran and Dr. George Kirkham. The City makes procedural and substantive objections. First, the City objects in its Reply to the Plaintiff's Memorandum Contra (doc. # 27) that the Plaintiff did not offer the reports of Dr. O'Halloran or Dr. Kirkham in a manner cognizable under Rule 56. Indeed, in the Plaintiff's Memorandum Contra (doc. # 23), the reports of Dr. O'Halloran and Dr. Kirkham are excerpted, but not offered into evidence by means of a verified affidavit. The Court may consider reports by "experts" as an exhibit only if it is properly made part of an affidavit. *See* 10A Charles A. Wright,

Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2722 (1983). Plaintiff remedied its error and made the reports admissible by authenticating them and attaching them to an affidavit that meets the requirements of Rule 56(e) in its Motion to Allow Plaintiff to Submit the Reports (doc. # 34). Thus, the Court now can properly consider the reports as evidence.

 Second, the City argues that the reports of Dr. O'Halloran and Kirkham cannot be considered expert testimony. "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence], whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Initially, when Plaintiff had not yet properly offered the reports into evidence, there was no way for the Court to determine whether the theories propounded met the standard of "scientific knowledge." This problem has been remedied as to Dr. O'Halloran with the submission of the reports into evidence.[1] The report of Dr. O'Halloran specifies the materials he examined in reaching his conclusion and it discusses his extensive medical background, training, and publications. The Court is satisfied at this time that Dr. O'Halloran's testimony meets the *Daubert* standard for submission of scientific evidence.

The decision of the Honorable Judge Rhoades, Southern District of California, in *Price v. County of San Diego,* 990 F.Supp. 1230 (S.D.Cal.1998), does not change this Court's conclusion. In *Price,* Judge Rhoades concluded that the work of Dr. Donald Reay, the scientist credited with first hypothesizing the concept of po-

---

1. The Court does not consider the report of Dr. Kirkham as being offered as scientific evidence as to the cause of Wilder's death. Dr. Kirkham, a criminologist, offers his opinion as to the knowledge in the national

criminal justice community about positional asphyxia and the adequacy of the training provided by the Cincinnati Police Department.

sitional asphyxia, had been successfully refuted by the Dr. Tom Neuman, a researcher who is also Defendant City's expert in this case. *See id.* at 1237–38. Dr. Neuman attacked Dr. Reay's methodology and results. *See id.* Judge Rhoades stated that Dr. Neuman refuted both the premise that blood oxygen levels decrease after exercise—or for purposes of the case now before the Court, when a person is suffering from agitated delirium—and the ultimate conclusion that being restrained in a prone position prevents the lungs from replenishing the blood's oxygen supply.[2] *See id.* at 1238. According to the *Price* decision, even Dr. Reay now concedes that the restraint at issue was "physiologically neutral." *Id.*

Because Dr. Reay's study appears to be a critical foundation of subsequent studies supporting sudden death by agitated delirium with restraint, including those by Dr. O'Halloran, the City argues that Dr. O'Halloran's report should not be considered scientific evidence. The Court disagrees and believes this is a classic "battle of the experts" situation. First, Dr. O'Halloran offers his own published study on agitated delirium with restraint as support for his conclusion regarding Wilder. In *Price,* only Dr. Reay was specifically challenged. Dr. O'Halloran's studies may not have used the same methodology found to be flawed in *Price.*

Second, the University of San Diego study published by Dr. Neuman and his colleagues has its own limitations which makes questionable its application to Wilder's death. The University of San Diego study was restricted to healthy subjects. It did not attempt to duplicate field conditions. Finally, the study admitted that underlying medical conditions, intoxication, agitation, delirium, struggle, and body position could all affect respiration in a way that the study could not detect. Chan,

Vilke, Neuman, & Clausen, Restraint Position and Positional Asphyxia, *Annnals of Emergency Medicine,* November 1997 (attached to Report of Dr. Tom Neuman, attachment # 1, Defendant City's Reply to Plaintiff's Memorandum Contra (doc. # 27)). At the time of his death Wilder was obese, had tested positive for marijuana, and was suffering from agitated delirium. These factors differentiate him from the study participants. On the basis of the record before the Court at this time, the Court cannot conclude that the University of San Diego study debunks the theory of positional asphyxia to an extent rendering the testimony of Dr. O'Halloran inadmissible as scientific evidence.

## B. Analysis of the Evidence

### 1. The Third Element of § 1983 Liability for Failure to Adequately Train

■ The Court will begin by examining the third element of § 1983 liability for failure to adequately train. Plaintiff must raise a genuine issue of material fact regarding whether the manner by which the Defendants restrained Wilder was closely related to or caused his death. *See Berry,* 25 F.3d at 1346. If it did not, then there can be no finding that the Defendants violated Wilder's Fourth Amendment or Fourteenth Amendment rights. In support of the argument that agitated delirium with restraint was the cause of Wilder's death, the Plaintiff has provided the Court with a report by Dr. O'Halloran and a press release issued by Dr. Lee Parrott, the Hamilton County Coroner. Dr. Parrott describes the condition of agitated delirium with restraint as follows:

> Key elements defining the condition are violent agitation on the part of the subject, usually accompanied by bizarre or

---

2. Dr. Reay's study and Dr. Neuman's refutation both specfically focus on the hogtie restraint, a restraint more strenuous than the one used on Wilder. In the hogtie restraint, the person is placed in a prone position and his ankles and wrists are "tied" together above him. Intuitively, if the hogtie restraint does not affect respiration, a less severe prone restraint would not either.

threatening behavior, sometimes associated with a psychiatric disorder, but more commonly related to the used of psychoactive stimulant drugs such as cocaine, and restraint by police, medical personnel or friends.

By itself, delirious mania can end in death, ... but the risk of sudden death is fairly low. By itself, restraint, unless unreasonably restrictive, poses a very low risk of sudden death. Together, however, the two are potentially lethal....

Parrott press release, attachment #1 of Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment (doc. #23).

After reviewing various documents involving Wilder's scuffle with police, his restraint and his subsequent death, Dr. O'Halloran, a forensic pathologist, concludes "with a reasonable degree of medical probability, that Mr. Wilder died from the effects of restricted respiration while being restrained prone." Report of Dr. Ronald O'Halloran, attachment #1 of Plaintiff's Motion to Allow Plaintiff to Submit the Reports (doc. #34). He further explained:

> The apparent sudden loss of consciousness, breathing and pulse while being held prone on the floor, handcuffed with ankles tied together, and with most witnesses/participants agreeing that the partial weight of one or more police officers, firefighters and friends involved with the restraint procedure was [sic] applied to Mr. Wilder's upper torso, makes it very likely that the restraint was a major cause of his death. The timing of the sudden loss of consciousness and death in such close proximity to the restraint procedure is the most telling factor in implicating a cause and effect relationship.... No other cause of death was found at the autopsy. No dangerous levels of illicit or prescribed drugs were found in his blood collected at autopsy.
>
> ....

His confused state of mind and associated violent behavior precipitated the restraint ... and the ensuing struggle undoubtedly lead to some degree of physical exhaustion, which probably made him more susceptible to asphyxia and fatal cardiac dysrhythmia while restrained with weight on his upper torso.

> ....

> In summary, I agree with the Coroner that William Wilder died from the effects of restraint while in a mental state of agitated delirium.

*Id.*

Not surprisingly, the City's expert came to a different conclusion after reviewing various documents regarding Wilder's death. Dr. Neuman, a Professor of Medicine and Surgery at the University of California, San Diego, concluded "to a reasonable degree of medical probability that Mr. Wilder did not die of asphyxiation due to being placed in a restrained position." Report of Dr. Tom Neuman, attachment #1, Defendant City's Reply to Plaintiff's Memorandum Contra (doc. #27). Instead, Dr. Neuman offered a different cause of death:

> Mr. Wilder died of a sudden cardiac arrhythmia that occurred as a result of his enlarged dilated heart. The exertion of the struggle with his friends and the police may have contributed to his death. *Asphyxia was not the cause of death* and the restraint position did not cause a physiologically relevant change in Mr. Wilder's ventilation.

*Id.* (emphasis in the original).

The factual question remains, therefore, as to whether the action of the individually named Defendants in placing Wilder in a prone position contributed to his death.

### 2. The First and Second Elements of § 1983 Liability for Failure to Adequately Train

The Court will next consider together the first two elements of § 1983 liability for failure to adequately train.

The Court again finds that genuine issues of material fact remain. Plaintiff concedes that the training policy at issue was facially valid under the Constitution. Therefore, the Plaintiff must prove that "the municipal action was taken with 'deliberate indifference' to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Stemler v. City of Florence,* 126 F.3d 856, 865 (6th Cir.1997) (quoting *Board of Cty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997)). The question then, is whether it was known or obvious that placing a person showing signs of delirium in a prone restraint could result in sudden death.

"[A] plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond." *Stemler,* 126 F.3d at 866. As the City points out, the Plaintiff cannot point to similar in-custody deaths in Cincinnati that would have given notice to the City of the potential dangers of restraining an excited person in the prone position. The in-custody death of Daryll Price in similar circumstances occurred after Wilder's death.

Deliberate indifference can be proven without a showing of prior pattern of constitutional violations:

> [I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situations will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision to not train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also

support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

*See Bryan Cty.,* 117 S.Ct. at 1391. Plaintiff provides evidence from which a reasonable jury could infer that dealing with highly agitated persons was a recurring situation for law enforcement officials nationwide and in Cincinnati and that a violation of civil rights is predictable result of being inadequately trained to handle such persons.

Plaintiff provides evidence that City officials knew of the potential danger of the prone restraint before Wilder's death. The City's 1995–1996 In–Service Training schedule called for a session on Officer Safety/Use of Force, including "the topic of deaths in custody, particularly positional asphyxia." Attachment # 4, Plaintiff's Memorandum in Opposition (doc. # 23). Moreover, the Cincinnati Police Department participated in and received the Final Report of the Custody Death Task Force study by the City of San Diego Police Department in 1992. The study found that restraint-related in-custody death was a "significant law enforcement problem nationwide" with many incidents involving persons intoxicated on stimulant drugs or suffering from mental illness. The study provided a list of symptoms characteristic with sudden death by positional asphyxia along with recommendations on restraining "at risk" individuals. The Task Force recommended that "[o]nce an individual has been controlled and handcuffed, the officer should roll the subject onto his/her side, or into a sitting position as soon as possible to reduce the risk of positional asphyxia." Attachment # 2, Plaintiff's Memorandum in Opposition (doc. # 23).

Finally, the Plaintiff submits the expert opinion of Dr. Kirkham:

> Every law enforcement officer, especially those assigned to a field position, should expect to encounter on a regular basis persons who are combative, deliri-

ous, suffering from acute intoxication, or suffering from some medical or psychological condition, including epilepsy, which requires immediate attention and proper care in order to avoid injury or death.... In addition, the phenomenon of positional asphyxia was known to the law enforcement community for at least a half-dozen years before the death of William Wilder. Literature and training materials were available to law enforcement agencies throughout the country.

Report of Dr. George Kirkham, Attachment # 2, Plaintiff's Motion to Allow Plaintiff to Submit the Reports (doc. # 34).

On the basis of this evidence the Court believes that a reasonable jury could find that the City had notice of the potential hazards of agitated delirium with restraint and that the City was deliberately indifferent in failing to adequately train the police and firefighters on how to deal with "at risk" persons. *Cf. Zuchel v. City and Cty. of Denver,* 997 F.2d 730, 737–39 (10th Cir. 1993) (finding sufficient evidence to support a jury determination that the Denver police training was inadequate when the police department failed to follow a training recommendation made by the district attorney). Plaintiff has raised at least a genuine issue of material fact on the first two elements.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff has provided sufficient evidence showing that genuine issues of material fact remain for trial, and therefore, Defendant City of Cincinnati's Motion for Summary Judgment (doc. # 21) pursuant to Rule 56 of the Federal Rules of Civil Procedure is hereby **DENIED.**

**IT IS SO ORDERED.**