**DE JAGER CONSTRUCTION, INC., a Michigan Corporation, Plaintiff,**

v.

**Larry SCHLEININGER, et al., Defendants.**

No. 1:94–CV–239.

United States District Court, W.D. Michigan, Southern Division.

July 2, 1996.

Stephen C. Bransdorfer, Mark S. Bransdorfer, Bransdorfer & Bransdorfer, P.C., Thomas A. Hoffman, Wrigley & Hoffman, P.C., Grand Rapids, MI, for De Jager Construction Inc.

Richard W. Hanawalt, Richard W. Hanawalt Law Offices, Ventura, CA, for Larry Schleininger, Riverfront Associates.

Philip G. Henderson, Clary, Nantz, Wood, Hoffius & Cooper, Grand Rapids, MI, for David Oshinski, Sharon Oshinski.

James L. Wernstrom, Law, Weathers & Richardson, Grand Rapids, MI, for Patricia Denman, Peter De Jager, Gary De Jager.

James D. Adkins, Adkins & Garcia, Lansing, MI, for Charles Layton, New York National Builders Consultants ("NYNBC").

James R. Case, Kerr, Russell & Weber, Detroit, MI, for Peerless Insurance Company.

Stephen M. Denenfeld, Lewis & Allen, Kalamazoo, MI, Terry Abernathy, Law Offices of Terry Abernathy, Selmer, TN, for Tony Lambert.

## OPINION

QUIST, District Judge.

### Nature of Case

Plaintiff is a general construction contractor that builds the interiors of stores in shopping malls throughout the United States. The remaining defendants[1] are former employees of plaintiff and companies formed by these former employees. Among other things, plaintiff alleges that the defendants took kickbacks from subcontractors performing work for plaintiff in exchange for giving jobs to these subcontractors and in exchange for facilitating payment to these subcontractors. The sole basis for this Court's jurisdiction are claims under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. § 1962. The nature of this case and the background facts are more fully set forth in this Court's Opinion of March 13, 1996.

The plaintiff apparently expects to call as expert witnesses certified public accountants, Gerald R. Humes and Robert W. Schellenberg, to prove the amount of damages sustained by plaintiff because of the alleged wrongful acts of defendants. In response to certain motions[2] filed by defendants, including Peerless Insurance Company, this Court held a hearing on April 9, 1996, in order to determine whether the testimony of Humes met the requirements of admissibility under Fed.R.Evid. 702. Schellenberg also testified at the hearing, but his testimony seemed to be limited to trying to bolster Humes' testimony. At the conclusion of the hearing, this Court requested additional briefs from the parties. The Court has now reviewed the supplemental briefs.

During the hearing on April 9, the Court expressed doubt about the admissibility of sworn affidavits and statements (for convenience called "statements") from plaintiff's subcontractors which this Court thought plaintiff might seek to introduce into evidence to support the substance of its case and upon which Humes relied in reaching his opinions. The Court noted that the statements appeared to be hearsay. In response to the Court's comment, plaintiff's counsel asserted that the statements were admissible into evidence as statements against the penal interest of the persons making the affidavits—giving kickbacks is a crime.[3] In addi-

---

1. Plaintiff's fidelity bond issuer, Peerless Insurance Company, has settled with plaintiff.

2. The motions are captioned motions for partial summary judgment, but they are more in the nature of motions in limine.

3. The rule of evidence which governs the admissibility of the affidavits and statements is Fed. R.Evid. 804(b)(3). The first requirement of this rule is that the declarant be unavailable as a witness. Whether evidence is admitted under

tion, during their testimony Humes and Schellenberg asserted that the statements were the type of material upon which a certified public accountant would rely in reaching the expert opinions that plaintiff seeks to have introduced in this case.

Based upon this Court's understanding that plaintiff would attempt to introduce the statements into evidence, this Court required plaintiff to provide information which would help this Court determine, prior to trial, whether the affidavits were admissible under Fed.R.Evid. 804(b)(3) as statements against pecuniary or penal interest. Plaintiff responded to this Order. Plaintiff's response states that it intends to call the declarants as witnesses in the case.[4] Therefore, the evidentiary issue regarding admissibility of the sworn statements under Fed.R.Evid. 804(b)(3) became moot.

The information supplied in response to this Court's Order of April 15, 1996, is helpful, however, in determining the admissibility of the proffered expert opinions of Humes and Schellenberg.

## I. Testimony of Gerald R. Humes

Gerald R. Humes is a certified public accountant who has been retained by plaintiff to assist in the prosecution of this case. According to plaintiff, Humes has spent about 2000 hours investigating plaintiff's claims. Plaintiff seeks to call Humes as an expert witness under Fed.R.Evid. 702 to testify about the amount of damages that plaintiff has sustained because of the alleged wrongdoing of defendants.

▉▉▉ This Court agrees with plaintiff that it need not prove its damages with mathematical certainty. A reasonable esti-

mate of the damages is sufficient. At the same time, damages cannot be based upon mere speculation coming into evidence under the guise of expert opinion. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th Cir.1988). The question presently pending before this Court is whether Humes is making a reasonable estimate of the losses suffered by plaintiff, whether he is engaged in speculation, or worse, whether he is weaving a story. Questions of credibility are for the jury. Yet, this Court has the duty to determine the admissibility of evidence under the Federal Rules of Evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995). The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995); *Muzzey v. Kerr–McGee Chemical Corp.*, 921 F.Supp. 511, 518 (N.D.Ill.1996). Courts are not to be concerned with the reliability of conclusions generated by valid methods, principles, and reasoning. *See American & Foreign Ins. Co. v. General Electric Co.*, 45 F.3d 135, 138 (6th Cir.1995). Rather, district courts are only to determine whether the principles and methodology underlying the testimony are valid. *Id.*

Fed.R.Evid. 702 provides that an expert can be called if his specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue. Fed. R.Evid. 703 provides that the basis of the

---

this rule is within the sound discretion of the district judge. *United States v. Noel*, 938 F.2d 685, 688 (6th Cir.1991). The question of whether a statement is admitted under Rule 804(b)(3) can only be answered in light of all the surrounding circumstances. *Williamson v. United States*, —— U.S. ——, ——, 114 S.Ct. 2431, 2437, 129 L.Ed.2d 476 (1994). For the purposes of Rule 804(b)(3), the word "statement" means a single declaration or remark, as opposed to a complete narrative. *Id.* In *Williamson*, a criminal case, the Court held that (1) only those parts of a statement that are against interest are admissible, and (2) neutral statements, those neither

favorable nor against the declarant's interest, are inadmissible.

4. Page 3 of Plaintiff DeJager Construction, Inc.'s Brief on Admissibility of Subcontractor and Other Sworn or Recorded Statements and Affidavits Under Fed.R.Evid. 804(b)(3) (docket no. 340) states, "It is important to note that Plaintiff intends to bring all of the persons listed below to testify in person at the trial." Among the persons listed are the declarants Tom Ciesla and Jim Richards and statements regarding the defendant Schleininger.

expert's opinion need not be admissible in evidence *if* it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences." Humes has relied heavily upon the hearsay statements of former subcontractors and employees in reaching his opinions.

In examining the proffered testimony of Humes (and Schellenberg) under the standards set forth in the preceding paragraphs, this Court has kept in mind the nature of the expertise asserted by Humes (and Schellenberg)—the expertise of certified public accountants. It is of limited assistance to a jury for a CPA to do simple mathematical calculations which a reasonable juror or lawyer could perform. This Court recognizes, however, that certified public accountancy is a skilled profession which requires, in many instances, considerable education, training, experience, judgment and skill beyond that which an ordinary juror would possess. CPA's are subject to accountancy standards and are licensed by the state much as lawyers are licensed professionals. In other words, a CPA generally possesses the "specialized knowledge" to qualify as a helpful expert witness under the proper circumstances. Whether an "expert" qualifies to answer specific questions in a particular case is a different issue. *Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993); *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995).

The first problem with Humes' testimony is that it blurs the distinction between substantive liability and a calculation of damages. This Court is convinced that Humes' testimony, as presented to this Court on April 9, 1996, is as much substantive assertions and arguments about the liability of the defendants as it is a calculation of damages. As explained by Schellenberg, Humes' testimony assembled a group of facts from which a conclusion would be drawn that defendants were engaging in the wrongful acts alleged in the complaint. As explained in *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995), an expert cannot opine on the ultimate liability of defendants even

though an expert may, under some circumstances, give the jury all of the information from which it can draw inferences as to the ultimate issue. This Court holds that if the plaintiff intends to prove the existence of kickbacks and other types of wrongful behavior, plaintiff must do so by using facts introduced into evidence, as distinguished from an expert opinion based upon facts which may or may not have been admitted into evidence. It is the jury's responsibility to determine if the defendants did the things that plaintiff claims, and the jury is to make this decision based on evidence. Much of plaintiff's case will turn on the jury's determination as to the credibility of witnesses. Expert testimony is not needed to determine whether a declarant or witness is telling the truth. If Humes' testimony is permitted to come into evidence as it was presented to this Court during the April 9 hearing, a jury would almost certainly be confused into believing that Humes' calculations of losses are evidence that the charged wrongful conduct actually occurred. Thus, Humes' opinion does not meet the threshold test of assisting the trier of fact to understand the evidence or to determine a fact in issue. Fed.R.Evid. 702.

More importantly, after listening to Humes testify and discovering the basis for his opinions, this Court is convinced that Humes is seeking to weave a story. In doing so, Humes has selected those portions of the available material which support his client's position, and has deliberately ignored other portions that do not support his client's claim.

### A. *Humes' Testimony Regarding Schleininger*

Plaintiff alleges it suffered three basic categories of damage as a result of the dishonest acts of defendant Larry Schleininger. The first basic category is kickbacks. The second category is the loss to plaintiff from phony extras, straw men on the payroll, dumpster fraud, demolition fraud, etc. The third category of damage is the operation of Riverfront Associates.

Humes has quantified the kickback losses to plaintiff as follows: (1) 100% of the subcontractors contacted by plaintiff admitted paying kickbacks to Schleininger; (2)

Schleininger bragged about the amount of money he was making from plaintiff; (3) Schleininger has claimed large assets which cannot be explained by his or his wife's income; (4) On his income tax reports, Schleininger has claimed personal income from subcontractors that issued 1099's to him—presumably kickback payments. Humes also relied upon the following information to establish losses: plaintiff's former employee Marc Harris told plaintiff and Humes that he was engaged in fraud upon plaintiff; Marc Harris also told plaintiff and Humes that whatever he learned about fraud he learned from Schleininger; Harris has also estimated the amounts of fraud that he, Harris, committed upon the plaintiff; Humes has taken a rate of loss estimated by Harris and assumed that Schleininger defrauded plaintiff at the same rate.

### 1. Reliance upon statements by subcontractors.

As to that part of plaintiff's case which involves alleged kickbacks to Larry Schleininger, Humes relied to a very large extent upon parts of the subcontractor affidavits which this Court believed plaintiff was going to try to introduce as evidence. An examination of the information provided has convinced this Court that the subcontractor affidavits are inherently unreliable for the same reason that this Court would have ruled that they were not admissible into evidence. The statements were given under oath by subcontractors of the plaintiff on construction jobs in different states. The statements were given to plaintiff's president or plaintiff's counsel after the subcontractors were solicited by plaintiff. The statements claim, in essence, that these subcontractors paid kickbacks to the defendants. The statements were given, however, under circumstances which could reasonably be construed to be of financial benefit to the subcontractor who gave the statement.

Based upon the information provided to the Court in response to its Order, it is apparent that the contested statements were not made against any pecuniary interest of a declarant. There was no financial risk to the declarant. Even though there may not have been an obvious *quid pro quo* of additional work to the declarant from plaintiff, it appears that before giving the statements, at least some of the declarants were told and understood that cooperating with plaintiff by giving the statements could be to their financial advantage rather than to their financial disadvantage. In fact, many of the declarants did benefit financially after having given the statements. The following is a list of each person who gave a statement, his relationship to plaintiff, and the circumstances surrounding his statement that raise questions of reliability:

*Marc Harris:* Supervisor, DeJager Construction. Though he was not promised future work in connection with his sworn statement, Harris was subsequently and is still on the DeJager payroll for assisting in the investigation (docket no. 340 Exhibit A at ¶ 5; docket no. 341 Exhibit 1).

*David Oshinski:* Construction Coordinator, DeJager Construction. Prior to giving sworn statement, Oshinski told Richard DeJager he wanted to continue working at DeJager. Richard DeJager told him that if he fully cooperated in the investigation that he would consider continuing his employment (docket no. 340 Exhibit A at ¶ 6). Oshinski continued working for DeJager for seven weeks after giving his statement. Oshinski is a named defendant in this case.

*James Chambers:* Chambers worked for DeJager for approximately five years as an Architecture Coordinator. Prior to giving his statement, Chambers left DeJager for other employment and has not subsequently been employed by DeJager. Before giving his statement, however, Chambers expressed to Richard DeJager that he would like to be considered for employment by DeJager again (docket no. 340 Exhibit A at ¶ 7). At the outset of Chambers' statement, Richard DeJager relates a conversation he had with Chambers regarding future employment with DeJager: "Jimmy [Chambers] had called and I said I had an opening and so on and whatnot. And we talked and he had some ideas and we don't have to go into that.... And again, we wanted to discuss things a little further as far as job arrangements go and I shared with Jim at that time before we

discuss that, we had some other matters that we had to discuss due to his previous employment. And that was we had a need of discussing Riverfront" (docket no. 345 at 4).

*John Mahlum—Rainbow Construction:* Subcontractor. Prior to giving his statement, Mahlum left his business as a subcontractor to work for DeJager as a field supervisor. Mahlum continued working for DeJager after his sworn statement (docket no. 340 Exhibit A at ¶ 15; docket no. 341 Exhibit 4).

*Steve Pymm—Pymm Electric:* Subcontractor. Pymm did not work for DeJager after giving his statement. As with other out-of-state declarants, DeJager provided airfare, meals, and lodging while Pymm was in Grand Rapids giving his statement (docket no. 340 Exhibit A at ¶ 16; docket no. 341 Exhibit 5).

*Mark Christie—Center Point Glass:* Subcontractor. Christie did work for DeJager subsequent to giving his statement (docket no. 340 Exhibit A at ¶ 17). Payment history shows over $20,000 paid from February 1994 to March 1996 (docket no. 341 Exhibit 6).

*Ward Occhiline:* Subcontractor. Occhiline gave a statement to DeJager on March 4, 1995, in which he denied any wrongdoing. On March 5, 1995, Occhiline was paid for jobs performed for DeJager prior to that date (docket no. 340 Exhibit A at ¶ 18). Occhiline then informed DeJager his prior statement was not correct, and gave the sworn statement of March 5, 1995, in which Occhiline admitted he paid kickbacks to Schleininger. When asked why he decided to give his second affidavit, Occhiline answered, "I haven't felt good about this here since Dick [De Jager] approached me in Las Vegas, and I feel that if I ever am going to have any kind of relationship with Dick, and do his work, that I had to be on an honest basis with that man" (docket no. 341 Exhibit 7 at 48). Occhiline finished Defendant Schleininger's job at DeJager after Schleininger was terminated (docket no. 340 Exhibit A at ¶ 18).

*Bob Judson—R & O Electric:* Subcontractor. Judson worked subsequent jobs for De Jager and was paid approximately $8,710 in the twenty months following his statement (docket no. 340 Exhibit A at ¶ 19; docket no. 341 Exhibit 8).

*Ricky Hoehn—RA Hoehn Plumbing:* Subcontractor. Hoehn continued to work as a DeJager subcontractor subsequent to his statement and was paid over $65,000 in the two years following his statement (docket no. 340 Exhibit A at ¶ 20; docket no. 341 at Exhibit 9).

*Joseph Leonard and Bob Moore—L & M Electric:* Subcontractor. L & M Electric performed work for DeJager subsequent to Joseph Leonard and Bob Moore's affidavit (docket no. 340 Exhibit A at ¶ 21).

*Mike Ruane—Ruane Heating:* Subcontractor. Ruane continued doing jobs for DeJager after his statement (docket no. 340 Exhibit A at ¶ 22). Payment history shows Ruane received approximately $218,000 from DeJager in the twenty months following his statement (docket no. 341 Exhibit 11).

*Scott and Guy Keller—S.G. Keller:* Subcontractor. S.G. Keller continued working for DeJager after the statements (docket no. 340 Exhibit A at ¶ 23). Payment history shows the Kellers received approximately $33,500 from DeJager in the twenty months following their statement (docket no. 341 Exhibit 12).

*Steve Halstead—Innovative Builders:* Subcontractor. Halstead was a named defendant. He gave his affidavit on May 4, 1994, after he had been served the Complaint. DeJager paid Halstead $3,457.02 on that day for work previously completed for DeJager (docket no. 340 Exhibit A at ¶ 24; docket no. 341 Exhibit 13). After Halstead gave his affidavit, he was dismissed as a defendant (docket no 77).

*Tom Ciesla—American Electric:* Subcontractor. Ciesla continued to work for DeJager after giving his statement (docket no. 340 Exhibit A at ¶ 25). Payment history shows Ciesla received approximately $38,000 from DeJager in the seven months following his statement (docket no. 341 Exhibit 14).

*Jim Richards—B & J Plumbing:* Subcontractor. Richards did not work for DeJag-

er after giving his statement. As with other out-of-state declarants, DeJager provided airfare, meals, and lodging while Richards was in Grand Rapids giving his statement (docket no. 340 Exhibit A at ¶ 26).

Furthermore, statements were made with plaintiff's assurance that plaintiff would not pursue a civil or criminal remedy against the declarant. Richard DeJager or plaintiff's attorney, Stephen Bransdorfer, mailed subcontractors they suspected of being involved in improper activities "comfort letters" in which plaintiff expressed the understanding that subcontractors would cooperate fully in plaintiff's investigation, and "[a]ccordingly, the company will not initiate any action with law enforcement officials against you." Examples are attached as Exhibits 1 and 2. In a recorded telephone conversation, Richard DeJager told subcontractor Tom Leonard that included with the comfort letter "there will be a sample of lawsuit for you to look at. So understand that this is real. You understand what I am saying? ... You have a chance to go and get yourself clean right now" (docket no. 341 Exhibit 10 at 3). While plaintiff often told declarants that it had no control over any future criminal or civil action against subcontractors, the tone of the "comfort letters" and Richard DeJager's telephone conversation could give a reasonable person the impression that making the statements may help him with any future legal problems.

The Supreme Court has held that a declarant caught red-handed with cocaine may have believed his self-interest would be served by confessing and implicating defendant as his supplier. *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). *See also Fuson v. Jago,* 773 F.2d 55 (6th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3334, 92 L.Ed.2d 739 (1986) (the statement of a co-defendant, made while in custody, was not against interest as it could have been made to curry favor) (citing Ohio law). Many statements of declarants in the instant case implicate others and limit their own involvement in the alleged scheme. *See, e.g.* docket no. 342 at 22 ("and again, [that is] the reason I would put Larry Schleininger higher up on the echelon than myself."); docket no. 342 at 49 ("And in Larry Schleininger case—and I hope it shows that was not in my case—in Larry Schleininger, that was the basis of everything he did was the fear factor, fear factor with the subs.").

In utilizing the statements, Humes has decided to accept certain parts of the statements and to totally disregard other parts. Humes stated in his testimony before this Court that after an initial period of cooperation with plaintiff,[5] some of the declarants stopped cooperating—it got harder and harder for plaintiff to get the information it was seeking. Humes then increased his estimate of what a subcontractor paid to Schleininger as a kickback. The revised estimate of the kickback amount was higher than that stated by the declarant. This Court can discern no principled basis or rationale for such a hike to the kickback amount except Humes' desire to help his client. In essence, Humes has accepted at face value information contained in the statements which support the greatest amount of kickback damages to plaintiff, whether that information is reliable or not. Humes has hiked the amounts above that admitted by the subcontractors because he asserts, without facts, that the declarants really paid more kickbacks than they admitted.

Also, because 100% of the subcontractors *contacted* by plaintiff admitted giving kickbacks to Schleininger, Humes assumed that 100% of the subcontractors that worked on Schleininger jobs paid kickbacks to Schleininger. Humes used the 100% figure even though he testified at his deposition that he did not know if any of the subcontractors plaintiff did not contact ever paid kickbacks to Schleininger. Humes' Dep. at 310. It appeared to this Court, however, that plaintiff deliberately contacted those subcontractors most likely to have given kickbacks to Schleininger. This Court finds that there is no principled basis for assuming that 100% of the subcontractors on Schleininger's jobs paid kickbacks to Schleininger.

5. During this period of time plaintiff was paying many of the declarants.

Other than the bold assertions of Humes and Schellenberg, there has been nothing presented which would lead this Court to believe that these hearsay statements of subcontractors are the type of facts upon which a certified public accountant would rely when rendering opinions such as those given by Humes.

## 2. Reliance upon statement by Marc Harris.

Humes has also relied upon the statement of Marc Harris to establish the amount of loss plaintiff sustained in California because of Larry Schleininger's defalcations. As stated above, in addition to the alleged kickbacks, plaintiff claims that Schleininger defrauded plaintiff by, among other things, keeping scrap for himself and putting "straw men" on the payroll. In order to estimate the damage caused by Schleininger's defalcations in these areas, Humes has relied, in part, upon Harris's statement about the amount of money that **Harris** received from these types of fraud. Without any evidence to support his position, Humes has made the enormous assumption that **Schleininger** took money at the same rate as Harris. Harris testified in his deposition that he has no knowledge regarding the amount of kickbacks taken by Schleininger. Nor did he have knowledge of other types of fraud being perpetrated by Schleininger. Based upon the record before this Court, there is no basis for the assumption that Schleininger took kickbacks or engaged in other fraud at the same rate as did Harris. Harris does not constitute a "scientific sample" from which an expert statistician, accountant or mathematician would project damages caused by others.[6] Furthermore, Schleininger's own statements about the amount of money he was making do not help Humes' opinion.

When Schleininger made such statements, he may have also been referring to the money his wife was making in her businesses, and the money his wife had received from a relative's estate.

Finally, Humes' opinion regarding damages attributable to Schleininger has little, if any, probative value. Humes' opinion would confuse the jury and prejudice Schleininger. Because it comes from an "expert", Humes' opinion would tend to lead a jury into believing that his methodology is correct. Admitting Humes' opinion would put this Court's imprimatur upon very speculative evidence. This Court rules that Humes' opinion regarding damages attributable to Schleininger is inadmissible under Fed.R.Evid. 403.

Therefore, plaintiff will not be permitted to introduce Humes' present calculation of damages attributable to kickbacks given to Schleininger or to other types of fraud committed by Schleininger.[7]

### B. *Humes' Testimony Regarding Charles Layton and NYNBC*

In addition to rendering an expert opinion regarding the losses attributable to Schleininger, plaintiff seeks to have Humes render an opinion as to losses attributable to Charles Layton and Layton's company, New York National Building Consultants ("NYNBC"). Layton, an employee of plaintiff, formed NYNBC after a meeting in January 1991, wherein Richard DeJager, plaintiff's president, told employees that they could form companies to perform subcontract work on plaintiff's projects so long as their prices were as good as other potential subcontractors. These companies are now referred to as "secret companies" and are more fully discussed in this Court's Opinion of March 13, 1996.[8]

---

6. Harris was not randomly selected and he has a bias. *See* p. 11. Furthermore, a statistic of one in a universe of about five is not a sample, and a sample of one has an excellent statistical chance of being an aberration.

7. Plaintiff is free to prove that Schleininger took kickbacks and otherwise defrauded plaintiff. Plaintiff can introduce the testimony of subcontractors who paid kickbacks; it can introduce admissions of Schleininger such as Schleininger's statements about the amount of money he

was obtaining from plaintiff. From this type of evidence on the record, plaintiff can argue the amount of loss it sustained because of wrongs committed by Schleininger.

8. Although Richard DeJager gave permission to form these "secret companies", plaintiff claims that defendants wrongfully withheld from Richard DeJager the knowledge that the companies were, in fact, formed. It is undisputed that plaintiff's top managers were informed of the companies.

Initially, Humes prepared different calculations of the amount of loss attributable to defalcations of Layton/NYNBC. Two of these calculation theories are known as: "Fraud: Fraudulent Activities Analysis" and "Fraud Secret Companies Cost To Build." In initially calculating losses allegedly attributable to Layton/NYNBC, Humes combined the "Fraud: Fraudulent Activities Analysis" and "Fraud Secret Companies To Build" analysis and, with respect to each job, chose the higher number. Humes' Dep. at 272; Summary of Loss Calculations with respect to Charles Layton/NYNBC.

During the April 9 hearing, counsel for Layton/NYNBC focused upon damages claimed by plaintiff under the "Fraud: Fraudulent Activities Analysis." This calculation is essentially an analysis of items such as using plaintiff's employees to perform NYNBC subcontracts. Humes claims that plaintiff paid for this work twice—once directly to its employees and then again through NYNBC. Even assuming that NYNBC was a legitimate company formed with the permission of plaintiff, such double billing would give rise to a claim against Layton/NYNBC.

At the hearing on April 9, and with subsequent submissions, Layton/NYNBC succeeded in convincing this Court that Humes was not making an honest calculation of plaintiff's losses based upon the "Fraud: Fraudulent Activities Analysis"—or any other analysis. Evidence refuting Humes' analysis on Job No. 6342 was contained in the calendar and time schedules to which Humes had access for months. When it became apparent at the hearing that Humes' underlying methodology was deliberately misleading, this Court instructed counsel for plaintiff and Layton/NYNBC to meet and determine if damage calculations on the jobs could be resolved without the need for trial. This Court is now informed by both counsel that plaintiff has withdrawn $23,591.12 of its original claim for $30,218,17 on Job No. 6342. Of the $6,627.05 remaining on that claim, $3,360.00 is attributable to Layton's salary. Assuming the merits of plaintiff's substantive claim against Layton/NYNBC, whether or not Layton's salary is a proper item of damages may be a legitimate issue to be resolved at trial. The point is, however, that after further investigation upon direction of the Court plaintiff abandoned most of its damage claims against Layton/NYNBC for losses on Job No. 6342 because they could not withstand scrutiny.

Now it appears that plaintiff has abandoned its "Fraud: Fraudulent Activities Analysis" and will attempt to have Humes testify as to his "Fraud Secret Companies Cost To Build" theory of damages. Under this theory, Humes would calculate the difference between the money plaintiff paid to NYNBC and the money, "in hard costs", NYNBC paid to build the jobs involved. Humes would not allow overhead or a profit. There are two main problems with the "Fraud Secret Companies Cost To Build" theory of damages. The entire theory is based upon the premise that there were secret companies formed by plaintiff's employees contrary to the interests and desires of plaintiff. As this Court explained in its March 13, 1996, Opinion, the formation of these companies by plaintiff's employees was explicitly permitted by plaintiff. See pp. 7–10, 22 of this Court's prior Opinion (docket no. 323). This ruling, which was based upon the record before the Court at that time, was made in connection with Peter and Gary DeJager's motion for summary judgment. Layton/NYNBC have not moved to dismiss the "secret company" claim against them; therefore, technically that claim against Layton/NYNBC still exists. Whether plaintiff will have this claim submitted to a jury against Layton/NYNBC remains to be seen.

In any event, subject to part III of this Opinion, this Court will not permit Humes to testify on the "Fraud Secret Companies Cost To Build" theory. Humes' methodology has been proven to be, at all turns, untrustworthy.

### C. *Humes' Testimony Regarding Tony Lambert*

For the reasons stated in this Opinion and subject to part III of this Opinion, Humes will not be permitted to render expert opinions regarding Tony Lambert.

### Conclusion Regarding Humes

■ Mr. Humes, in the guise of expert opinion, is asserting arguments on behalf of his client, perhaps hoping that the fallacies in his arguments will go unnoticed. Unfortunately for Humes and for plaintiff, in this particular case, Humes' fallacies were caught. This Court wishes to make clear that its decision regarding Humes' testimony is not limited to mere mathematical mistakes. This Court's decision regarding Humes is based upon Humes' *modus operandi* of making unsupported assertions and projections, of deliberately ignoring documents and figures which would strike a certified public accountant in the face, and of picking and choosing among purported facts to maximize plaintiff's damages. To paraphrase S.I. Hayakawa referring to his participation in formulating the federal budget—he never learned to subtract; addition was the only necessary mathematical skill. Therefore, Humes will not be permitted to render any opinion regarding damages sustained by plaintiff. He may possibly submit a calculation based upon facts admitted into evidence as set forth under part III of this Opinion.

### II. *Testimony of Robert W. Schellenberg*

Schellenberg's testimony on April 9, 1996, seemed to be limited to vouching for Humes' opinion. Schellenberg testified that *AICPA Professional Standards that Relate to Litigation Services Statement on Standards for Consulting Services # 1* incorporates accounting standards that the accountant (1) exercises technical competence; (2) have sufficient relevant evidence; and (3) exercises due diligence. This Court, and not Schellenberg, is to decide whether Humes' testimony is admissible. For the reasons stated, this Court has ruled that Humes' testimony is not admissible because it does not exhibit appropriate technical competence and is not supported by sufficient reliable and relevant evidence.

### III. *Testimony That May Be Permitted*

It is possible that there will be numerous items of damage which plaintiff can prove. This Court *will consider* permitting Humes or Schellenberg to assemble, calculate and present a summary or compilation of those damages so that the Court and jury do not have to search through numerous documents and facts to determine damages. So that the Court is clear: any such calculation would have to be based upon facts in evidence and must be presented in a clear and consistent manner—no picking and choosing to weave a story, no assumption that Schleininger took kickbacks at the same rate as Harris, etc. Humes and Schellenberg will not be permitted to give any opinion regarding the existence of fraud (such as is contained in the written opinions). Neither of these witnesses will be permitted to testify regarding damages until after plaintiff has informed the Court that it has concluded its case on liability. Fed.R.Evid. 611(a). After this Court has heard the basis and methodology for the testimony, this Court will rule on the admissibility of the proffered testimony. The Court further rules that before giving any summary or calculation, the witness must first testify as to the underlying facts and data upon which the summary or other calculation is based. Fed.R.Evid. 705.

### IV. *Pass–Through Damages*

Some defendants claim that because plaintiff never paid more than the lowest bid and may even have received higher profits because of illegal payments to defendants (on cost-plus contracts), plaintiff never suffered any damage. As suggested previously on the record, this Court rejects this "pass-through" argument. If, for example, a subcontractor kicked back money to an employee of plaintiff, that money belonged to plaintiff and not to plaintiff's employee. Or, the plaintiff could have reached a contract with the subcontractor at a lower cost. Cf. *United States v. Parrish,* 84 F.3d 816 (6th Cir.1996).

### ORDER

In accordance with the Opinion entered this date,

**IT IS HEREBY ORDERED** that Humes will not be permitted to render any opinion regarding damages sustained by plaintiff except as follows: this Court will consider permitting Humes or Schellenberg to present a summary or calculation of damages provided the summary or calculation is based upon

456

facts in evidence and is presented in a clear manner. This testimony may only be presented after plaintiff has informed the Court that it has concluded its case on liability. Before giving the summary or calculation, the witness must testify as to the underlying facts and data upon which the summary or calculation is based. Neither Humes nor Schellenberg will be permitted to give any opinion regarding the existence of fraud.

**IT IS FURTHER ORDERED** that this Court rejects the "pass-through" argument.

EXHIBIT 1

## BRANSDORFER & BRANSDORFER, P.C.
ATTORNEYS AT LAW

SUITE 305, LEDYARD BUILDING, 125 OTTAWA AVENUE, N.W.
GRAND RAPIDS, MICHIGAN 49503
(616) 458-4004
FAX (616) 458-4422

January 14, 1994

Mr. John Mahlum
P.O. Box 300
Morton, MN 56270

Dear Mr. Mahlum:

Our client, De Jager Construction, Inc., greatly appreciates your assisting this office in the pending investigation on behalf of the company. It is our understanding that you will cooperate completely in informing us as to all information you now have and can obtain regarding harmful acts to the company.

Accordingly, the company will not initiate any action with law enforcement officials against you. Moreover, we will advise the insurance company of your complete cooperation.

Again, thank you for your cooperation.

Sincerely,

BRANSDORFER & BRANSDORFER, P.C.

Stephen C. Bransdorfer by MSB

Stephen C. Bransdorfer

SCB:tmp

EXHIBIT 2

# DEJAGER CONSTRUCTION INC.

75 60TH STREET, S.W. • P.O. BOX 815 • WYOMING, MICHIGAN 49518
• (616) 530-0060 • FAX (616) 530-9888 •

February _28_, 1994

HAND DELIVERED

Ruane Heating
17223 Sierra Hwy   112
Canyon County   California   91351

Dear _Mr. Lu_ :

De Jager .Construction, Inc. greatly appreciates your assisting this office in the pending investigation on behalf of the company. It is our understanding that you will cooperate completely in informing us as to all information you now have and can obtain regarding harmful acts to the company.

Accordingly, the company will not initiate any action with law enforcement officials against you. Moreover, we will advise the insurance company and any other outside parties of your complete cooperation.

Again, thank you for your cooperation.

Sincerely,

DE JAGER CONSTRUCTION, INC.