**H.C. SMITH INVESTMENTS, L.L.C., Plaintiff,**

v.

**OUTBOARD MARINE CORPORATION, Raytheon Company, Raytheon Aircraft Company, and Raytheon Aircraft Services, Inc., Defendants.**

No. 1:00–CV–128.

United States District Court, W.D. Michigan, Southern Division.

Jan. 23, 2002.

Jon R. Muth, S. Grace Davis, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for H.C. Smith Investments, L.L.C.

Susan L. Winders, Jones, Day, Reavis & Pogue, Chicago, IL, Thomas F. Koernke, Koernke & Crampton, PC, Grand Rapids, MI, for Outboard Marine Company.

Richard G. Ward, Sullivan, Ward, Bone, Tyler & Asher, PC, Southfield, MI, for Raytheon Company.

## OPINION

ENSLEN, District Judge.

Plaintiff H.C. Smith Investments, L.L.C. has moved to exclude testimony of four

expert witnesses (Ian Atkinson, William Ballentine, Mark Serbenski and Robert Stanford) listed by Defendant Raytheon Aircraft Services, Inc. These expert witnesses are intended to provide expert opinions on two subjects: (1) whether Plaintiff's consultant purchased a complete "pre-purchase inspection" of the purchased aircraft (as opposed to a document review inspection ("Part 135 inspection")); and (2) the age and cause of corrosion which was later discovered on the aircraft. The parties have now filed multiple briefs and many documents for the purpose of making a complete record. *See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000). The record is now sufficiently complete to allow decision. *See* Local Civil Rule 7.3(d).

### ALLEGATIONS AND FACTUAL BACK-GROUND

Plaintiff has sued Defendant for breach of contract, negligence and negligent misrepresentation relating to the inspection by Defendant in July 1997 of a 1969 Hawker–Siddeley aircraft (the "Hawker"). (Plaintiff's Second Amended Complaint, Dkt. No. 214.) The inspection was in connection with the August 1997 sale of the Hawker by Aero Toy Store to Plaintiff for $2.2 million dollars. (Aero Toy Store bought the plane from Outboard Marine Company in December 1996.) Plaintiff employed Travel Consultants Aviation ("TCA") as its purchasing consultant. Plaintiff, through TCA, employed Defendant to inspect the Hawker before purchase. Based on the inspection, the sale was consummated in August 1997.

Shortly after the purchase, Signature Flight Support conducted a "12–month inspection" of the Hawker. The 12–month inspection disclosed problems not pertinent to this suit, but apparently did not disclose to Plaintiff the extent of the corrosion at issue in this suit. Substantial cor-

rosion was found in September 1998 when another company which specializes in providing Hawker service—Aviation Material and Technical Support ("AVMATS")—conducted a mandatory 1200 hour/24–month inspection of the plane. The corrosion prevented the Hawker's use because it could not be certified under Federal Aviation Administration regulations. The parties dispute whether the corrosion was present during the July 1997 inspection.

Relating to the inspection by Defendant, there is competing testimony between TCA employee Lloyd Huth, who ordered the inspection, and Anthony Zeka of Defendant, who conducted the inspection. Huth has testified that he ordered a complete pre-buy inspection of the aircraft. (Huth Dep. at 134–135.) Zeka has testified that Huth, more or less, only requested a Part 135 inspection (which is an examination of the maintenance records of the plane). (Zeka Dep. at 55–56.) Zeka received a letter from TCA requesting a Part 135 inspection and "aircraft evaluation"—though he says that Huth was "primarily" concerned with the Part 135 inspection. (*Id.* at 55–56.)

### LEGAL STANDARDS

Briefing on this issue focuses attention on Federal Rules of Evidence 703–705 and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The *Daubert* decision requires the district courts to be "gatekeepers" to guarantee that the opinions offered would assist the triers of fact and are based upon a reliable scientific basis or other reliable specialized technical basis. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (applying *Daubert's* requirements to technical expert testimony).

In *Daubert,* the Supreme Court announced that the following four factors are relevant to a determination of whether there is a valid scientific basis for expert testimony: (1) whether a theory or technique has been tested; (2) whether the theory "has been subjected to peer review and publication"; (3) whether a technique is subject to a "known or potential rate of error" and whether the technique has standard controls or conditions to prevent error; and, (4) whether the theory or technique is generally accepted within the "'relevant scientific community.'" *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786 (quotation omitted); *Kumho,* 526 U.S. 137, 149–150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (quoting *Daubert*).

In *Kumho,* the Supreme Court further indicated that technical, non-scientific expert testimony must have a reliable basis to be admissible under Rule 702— even in cases where the *Daubert* criteria do not apply. *Kumho,* 526 U.S. at 151– 152, 119 S.Ct. 1167. This assessment means that the district court will apply "intellectual rigor" in determining whether technical expert opinions are reliable, regardless of whether the above *Daubert* factors are helpful in making that analysis. *Id.*

In applying Rules 702–705 to expert testimony, the district courts must also apply other requirements of the Federal Rules of Evidence. Thus, in the context of expert testimony, the district courts must enforce the requirements of Rule 403 that the probative value of testimony not be "substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid.Rule 403. While Rule 704 expressly permits experts to give opinions on ultimate issues of fact, the district court must also be careful not to allow expert testimony to infringe on its own authority to instruct as to the law or the jury's authority to determine ultimate issues such as the intent of a party. *See, e.g., Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir.1994) (overturning verdict where expert witness defined term "deliberate indifference"); *Woods v. Lecureux,* 110 F.3d 1215, 1220 (6th Cir.1997) (upholding district court's ruling prohibiting expert witness from defining the term "deliberate indifference").

## WITNESS QUALIFICATIONS

### 1. Qualifications of Jack Ballentine

According to his resume, Jack Ballentine was born in 1934 and is a high school graduate with a private pilot's license and with two years of service in the United States Army. (Plaintiff's Supplemental Materials, Dkt. No. 206, attachment 186.) His relevant experience and training comes from 46 years in the aviation industry. This includes two years helicopter maintenance training with the Army, training in the Piper Aircraft Sales School and long experience with several companies involved with aircraft sales, inspection, painting and maintenance. Ballentine's work history is an encyclopedia of airline sales, service and management jobs relating to small aircraft, beginning with his army service as a helicopter mechanic in 1955 and ending with his consulting work in 2000. In addition to many jobs for small aircraft dealers, the witness has spent the greatest portions of his career managing aircraft sales and service for Memphis Aero Corporation (a sales and service company out of Midland, Texas) and managing aircraft service of small aircraft for the Defendant (out of San Antonio, Texas). The witness retired from full-time work in 1999, but remained a consul-

tant and temporary manager of Defendant during 2000.

Ballentine has admitted that he is not a corrosion expert or metallurgist. (Ballentine Dep. at 63.) Although he has experience in managing paint shops, he lacks hands-on experience in treating and observing corrosion on Hawker aircraft. (*Id.* at 6–12, 26.) This is significant since, by all accounts, corrosion varies in aircraft based on the types of materials and the usage of the aircraft, as well as other factors.

### 2. Qualifications of Ian Atkinson

Ian Atkinson was trained as a production engineer in England and received a Bachelor of Science Degree from Trent University in Nottingham, England. He has worked since 1985 for aviation companies, including his current employer—the Defendant. His resume describes his work experience and expertise as centering upon business and operational management for the Defendant. (Plaintiff's Supplemental Materials, Dkt. No. 206, attachment 222.) He is presently employed as the General Manager of Defendant's Little Rock Service Center.

Atkinson has admitted during his deposition testimony that he does not regard himself as either a corrosion expert nor a metallurgist. (Atkinson Dep. at 25.) Additionally, he has admitted that certain of his opinions—that corrosion on the aircraft was caused by a later painting—were not definitive. Finally, he had admitted that it was possible to test his hypothesis on metals used in the aircraft (which he did not do). (*Id.* at 33.)

### 3. Qualifications of Mark Alan Serbenski

According to his resume, expert witness Mark Alan Serbenski is currently employed as a service manager for Centennial Aircraft Service. (Plaintiff's Supplemental Materials, Dkt. No. 206, attachment 214.) He received his Bachelor of Science degree from Western Michigan University in the field of Aviation Maintenance Management in December 1989. He is licensed in aircraft and power plant repair. He began his professional career in June 1989, doing aircraft service for Kal Aero Inc. Between December 1989 and March 2000, he worked for Western Michigan University maintaining its aircraft, teaching aircraft maintenance courses and serving as Director of Operations of the College of Aviation. In March 2000, he began his present employment with Centennial Aircraft Service. (*Id.*)

Serbenski has admitted in his deposition testimony that he has had no experience with jet aircraft, including the Hawker aircraft involved in this suit. (Serbenski Dep. at 8.) He further admitted that his experience with corrosion consisted of his training from one college course and his very limited experience with surface corrosion on aircraft. (Serbenski Dep. at 15–17.) Serbenski also has admitted that he is not a metallurgist, that his experience in metallurgy consisted of an undergraduate course on that subject and that he cannot comment on the opinions of Plaintiff's metallurgist. (Serbenski Dep. at 26–27.) Finally, he rates his opinion, that the use of a solvent or other chemical may have contributed to corrosion, as a mere "possibility." (*Id.* at 27–31.)

### 4. Qualifications of Robert Stanford, Jr.

Defendant's expert witness, Robert Stanford, Jr., is the owner of a professional company, Stanford and Associates, Inc., that buys, sells and brokers the purchase of small aircraft. (Plaintiff's Supplemental Materials, Dkt. No. 206, attachment 239.) Stanford is a high school graduate, a mili-

tary veteran, a former Vietnam helicopter pilot, and former private fixed wing pilot. (Stanford Dep. at 6–12.) Stanford indicates that his company sells one or two Hawker aircraft per year. (Stanford Dep. at 13.)

## ADMISSIBILITY OF SCOPE OF IN-SPECTION TESTIMONY

■ Each of the above expert witnesses is expected to offer opinions, based on their reading of various documents, depositions and other trial exhibits, that they did not understand the written request by TCA as a request for a complete pre-buy inspection. They are expected to testify that Huth's correspondence and conduct was inconsistent with a buyer requesting a complete pre-buy inspection because: he did not provide a "detailed" request for a pre-buy inspection; he did not allot enough time for an complete pre-buy inspection; he did not express any surprise at the cost of the inspection (which was less than the typical cost of a pre-buy inspection); and he did not engage in the type of rapport typical of a complete pre-buy inspection.

Since the scope of the contract between Plaintiff and Defendant is a matter of direct dispute between their competing witnesses—Huth and Zeka—this testimony violates the general rule that expert witness testimony not be used for the purpose of assessing another witness's credibility on non-technical or non-scientific points. *See United States v. Cecil*, 836 F.2d 1431, 1441 (4th Cir.1988); *Bachman v. Leapley*, 953 F.2d 440, 441 (8th Cir. 1992); *United States v. Benson*, 941 F.2d 598, 604 (7th Cir.1991); *United States v. Shay*, 57 F.3d 126, 131 (1st Cir.1995); *De Jager Construction, Inc. v. Schleininger*, 938 F.Supp. 446, 449 (W.D.Mich.1996). All of the disputed expert testimony does so.

In some instances, this is merely implicit from the testimony—when the expert witness gives reasons for believing that Zeka's understanding of the contract was more commercially reasonable than was Huth's understanding. In other instances, it is explicit—such as when some of the expert witnesses give the opinion that they have compared the deposition testimonies of Huth and Zeka and found Zeka's testimony to be more believable.

Furthermore, there is no significant reason for making an exception to the general rule prohibiting credibility assessment by an expert witness in this case. The substance of this testimony surrounds both the intent of Huth in contracting and the legal interpretation of the contract. Both of these subjects are generally taboo in terms of expert testimony because it is the role of the judge to instruct on the law and the role of the jury to decide ultimate questions of fact, particularly those respecting the intent and truth-telling of the parties. *See Cecil, supra.* While in an appropriate case, the interests of the party might warrant an exception to the general rule to permit limited testimony concerning highly technical matters which require the technical expertise of an expert witness, this is not such a case. The commercial matters at issue here are typical of contract disputes of any type—whether they involve airplanes, widgets or flying monkeys. These supposed experts have no real expertise on what Lloyd Huth may have intended or may have communicated to Anthony Zeka. The supposed technical knowledge of these witnesses is oversold in that the record does not establish that there are commercial practices for sale, repair and inspection of small airplane which are so regular that there was a significant likelihood that Lloyd Huth acted consistent with those practices.[1]

1. This is implicit in the brochure promoting Robert Stanford's company, which acknowl-

Based on the above analysis, the Court concludes that as to these issues the witnesses do not have "scientific, technical, or other specialized knowledge" which will assist the trier of fact to determine a fact in controversy. *See* Fed.R.Evid.Rule 702. Furthermore, the Court concludes that the witnesses' qualifications do not support the giving of the proposed expert testimony, *see id.,* and that the testimony should be excluded under Federal Rule of Evidence 403 because of the dangers of misleading the jury, undue delay, and cumulative testimony. There is no reason to hold a four-ring expert testimony circus on the subject of Lloyd Huth's credibility when it would detract from the main event—the testimony and cross-examination of Lloyd Huth. Therefore, the Motion *in Limine* will be granted as to all expert testimony on the scope of the inspection.

### ADMISSIBILITY OF CORROSION TESTIMONY

Plaintiff seeks to preclude three of the four listed experts—Atkinson, Serbenski, and Ballentine—from offering opinions that it was unlikely that the Hawker airplane contained significant corrosion at the time of its inspection in July 1997. The experts make essentially three arguments or hypotheses for these opinions: (1) that the Hawker received an adequate inspection for corrosion by Signature Flight Support shortly after its sale, which inspection did not disclose corrosion;[2] (2) that the Hawker received an adequate inspection, including x-rays, for corrosion by a testing company employed by Outboard Marine Corporation in 1996, which inspection not disclose corrosion;[3] and (3) that the Hawker was later repainted and may have been treated with a stripper or other chemical which contributed to corrosion at the lap joints.[4]

This testimony is plainly inadmissable. To admit it would be to treat the truth with such reckless abandon as to wholly forsake the truth gathering process of the trial. None of the witnesses are qualified by sufficient "knowledge, skill, experience, training or education" to venture their opinions. *See* Fed.R.Evid.Rule 702. The witnesses admit that they are not corrosion experts or metallurgists. They have scarcely have had classes in the relevant subjects, let alone achieved expertise. They have seen rust on airplanes, but this is a far cry from having the technical knowledge, experience or expertise so as to give a reliable opinion about the age or cause of the corrosion. The corrosion of a given metal is a scientific phenomena which, unlike some other phenomena, can be replicated and tested in the laboratory. This is the kind of scientific phenomena which, under *Daubert,* requires a scientific opinion based on the fundamentals of the scientific method and

---

edges that corporate buyers often contract in ways which are irrational and which an experienced buyer would avoid. While Huth might have been an experienced buyer, the manner in which he acted is best gauged by what he and Zeka said occurred during their conversations, subject to the effective tool of cross-examination, which will bring out any necessary points Defendant wishes to argue.

**2.** This premise is highly controversial. (*See* Plaintiff's Motion at 22.)

**3.** This premise is contradicted in that the x-rays and data from 1996 tend to indicate up to 22 points of corrosion; the corrosion was apparently not reported in the airplane's logbook, but was reported in the 1996 testing report. (*See* Plaintiff's Motion at 22 and Plaintiff's Supplementary Materials, Dkt. No. 206, Exhibit B.)

**4.** One problem with this theory is that while it explains the sudden appearance of corrosion at the lap joints, it does not explain its appearance on other portions of the plane.

scientific scholarship. There was no corrosion testing done by these witnesses. The witnesses have not published papers nor done any other scholarly work in the area of corrosion, metallurgy, physics, chemistry or advanced aviation studies. There is also no scientific consensus as to the opinions they offer.

Furthermore, the conclusions they offer are, as they admit, untested hypotheses. In the context of the other, contradictory record evidence in this case, these conclusions appear blatantly unreliable and misleading. *See Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir.1999) (stating that expert testimony is inadmissible where conclusions are drawn from facts which are contradicted by the record evidence). Accordingly, this evidence will be excluded under Federal Rules of Evidence 702, 703 and 403.

### *CONCLUSION*

For the reasons stated, the Motion *in Limine* will be granted and an Order shall enter wholly excluding the challenged testimony.